837 So.2d 1257 (2003)
In re Judge Perrell FUSELIER.
No. 2002-O-1661.
Supreme Court of Louisiana.
January 28, 2003.
*1259 Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, Ph.D., Chief Executive Officer, Judiciary Commission of Louisiana.
Steven R. Scheckman, Special Counsel, Mary F. Whitney, Assistant Special Counsel, Office of Special Counsel.
John Michael Veron, Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles; Allen Bruce Rozas, Rozas & Rozas, Mamou, for Judge Perrell Fuselier.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA.
VICTORY, J.
This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana that Respondent, Judge Perrell Fuselier of the City Court of Oakdale, State of Louisiana, be suspended without pay for a period of 120 days and ordered to reimburse the Judiciary Commission the costs incurred in the investigation and prosecution of this case.

PROCEDURAL HISTORY
On July 23 and 24, 2001, the Judiciary Commission filed Formal Charges consisting of five separate charges against Judge Perrell Fuselier. Charge No. 0156 alleged that Judge Fuselier abused his judicial authority by holding LaMeia Young in contempt of court for failing to appear in criminal court as a witness, dismissing the criminal charge against the defendant in that case, and contacting and meeting with Ms. Young's employer and notifying it that Ms. Young ignored the subpoena, thereby causing her to be fired, all in violation of Canons 1[1], 2A[2], and 3A(1)[3] of the Code of Judicial Conduct, and La. Const. Art. V, Sec. 25C (1974). Charge No. 0157 alleged that Judge Fuselier abused his judicial authority by conducting arraignments and accepting guilty pleas in criminal cases when no prosecutor was present on behalf of the State of Louisiana. The Commission *1260 alleged that Judge Fuselier's conduct violated La. Const. art. V, § 25(C) and Canons 1, 2A, 2B[4], 3A(1), 3A(4)[5], and 3A(7)[6] of the Code of Judicial Conduct. Charge No. 0158 alleged that Judge Fuselier exceeded his judicial authority by consistently dismissing misdemeanor traffic cases without the involvement of a prosecutor. Charge No. 0159 alleged that Judge Fuselier engaged in impermissible ex parte communications by accepting requests to "fix" traffic tickets and/or other offenses, and having an employee of his court contact the district attorney's office or city attorney's office to relay the messages. The Commission alleged that Judge Fuselier's conduct violated La. Const. art. V, § 25(C) and Canons 1, 2A, and 3A(6)[7] of the Code of Judicial Conduct. Charge No. 0160 relates to Judge Fuselier's handling of the collection of worthless checks. The Commission alleged that Judge Fuselier's conduct violated La. Const. art. V, § 25(C) and Canons 1, 2A, 2B, 3A(1), 3A(4), 3C[8], and 5C(1)[9] of the Code of Judicial Conduct.
The Commission conducted a hearing on the formal charges on February 15 and 16, and March 15 and 16, 2002. On June 13, 2002, the Commission issued its "Findings of Fact and Conclusions of Law," indicating its belief that Charges 0156, 0157, 0159 and 0160 had been proven by clear and convincing evidence, and recommending that Judge Fuselier be suspended from judicial office for 120 days and ordered to pay the costs of the prosecution of these *1261 proceedings.[10]

DISCUSSION

I. Jurisdiction, Standard of Review, and Burden of Proof
This Court has original jurisdiction in judicial disciplinary proceedings. La. Const. art. V, § 25(C). The grounds for disciplinary action against a judge are set forth in La. Const. art. V, § 25(C) which provides:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss or salary, during the pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
Under its supervisory authority over all lower courts, this Court adopted the Code of Judicial Conduct, effective January 1, 1976. This Code of Judicial Conduct is binding on all judges, and violations of the Canons contained therein may serve as the basis for the disciplinary action provided for by La. Const. art. V, § 25(C). In re Quirk, 97-1143 (La.12/12/97), 705 So.2d 172, 176. The standard of proof in judicial discipline cases is the clear and convincing standard, which requires that the level of proof supporting the Commissions' factual findings must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. Id.

Background Facts
Cases tried in Oakdale City Court concern enforcement of both state statutes and city ordinances. Violations of state statutes were prosecuted primarily by Todd Nesom, an assistant district attorney, under the supervision of Allen Parish District Attorney Douglas L. Hebert, Jr. On the other hand, City Prosecutor T.J. Davis was responsible for prosecuting violations of city ordinances during the time *1262 of the events described in the formal charges.[11] Mr. Davis is the father of Allen Parish Judge Joel Davis, whose complaint to the Commission about Judge Fuselier led to the filing of these formal charges.

Charge No. 0156
On January 25, 1999, the Commission received a complaint from LaMeia Young, who reported that she had been fired by her employer, Wal-Mart Stores, Inc., after Judge Fuselier wrongfully held her in contempt of court for failing to appear as a witness in the criminal case of State v. Landen, No. 98-1531 on the docket of the City Court of Oakdale, wherein Edwina Landen was charged with shoplifting from the Wal-Mart store in Oakdale. A subpoena was issued to Ms. Young, who was employed by Wal-Mart as a loss prevention officer, to appear as a witness at Ms. Landen's trial on October 26, 1998. Although Ms. Young was not personally served with the subpoena, she was aware of the proceeding.[12] Nevertheless, Ms. Young did not appear in court at 5:30 p.m., the time the Landen case was scheduled to be heard. At 6:40 p.m., Louise Vice, a secretary for the Allen Parish District Attorney's Office, contacted Ms. Young by telephone and reminded her that she was expected in court. When Ms. Young received this call, she said her supervisor had instructed her to install surveillance equipment at a Wal-Mart store in Ville Platte, which she was doing, but she promised Ms. Vice that she could be in Oakdale in 45 minutes. Ms. Vice reported this conversation to Judge Fuselier, who then agreed to delay hearing the Landen case until 7:30 p.m. When Ms. Young did not appear by that time, Judge Fuselier reconvened the attorneys and entertained the defendant's motion to dismiss the criminal charges. At 7:35 p.m., while this colloquy was ongoing, but before Judge Fuselier had taken any action in the matter, Ms. Young arrived at court. She was called to the stand and, under oath, she explained that she had not been personally served with a subpoena to appear. However, Ms. Young also admitted that she knew a subpoena had been left for her at the Oakdale Wal-Mart store, that an employee of the store had called her about the subpoena, and that she was late because she had forgotten that the Landen trial was set for that evening. After listening to her explanation, Judge Fuselier held Ms. Young in contempt of court, fined her $100, and sentenced her to perform one day of community service.[13] Judge Fuselier also dismissed the criminal charges against Ms. Landen. In open court, Judge Fuselier stated:
The Court is upset that the subpoenas issued by this court are disregarded as being unimportant. The charge will be dismissed and Ms. Young, I[am] really *1263 upset with you, ma'am. I'm upset with Wal-Mart. When a subpoena is issued by this court, this is not a suggestion or a request to appear. It's an order to appear. You don't have any choice. When you are served with a subpoena, or you are informed that a subpoena was issued, you must appear on the date and time set. If you were 10 or 15 minutes late, that's one thing. But we had to call and remind you, and on top of that, you still arrived late. I'm upset.... You ma'am, have wasted over two hours of our time tonight because you were not here....
One week later, on November 2, 1998, Judge Fuselier wrote a letter to the Wal-Mart home office regarding Ms. Young's "rather casual attitude about a subpoena to appear in court."[14] Judge Fuselier also met personally with Nancy Fletcher, the manager of the Oakdale Wal-Mart store, and Judy Coutee, Ms. Young's immediate supervisor. Ms. Coutee testified that, after *1264 receiving the letter, her boss told her to set up the meeting with Judge Fuselier, so she called the judge and set up the meeting for the next day. Judge Fuselier also testified that the Wal-Mart employees had requested the meeting with him. In any event, during the meeting, Judge Fuselier indicated that Ms. Young initially tried to blame her supervisor for her failure to appear in court, saying that her supervisor had ordered her to go to Ville Platte instead. Judge Fuselier then stated that Ms. Young changed her story when she was placed under oath and questioned. These statements may have been inaccurate, because Ms. Young never told anyone that her supervisor instructed her to ignore a subpoena, only that her supervisor told her to install the video surveillance equipment that night.[15] The Commission found that Judge Fuselier's actions led Wal-Mart to terminate Ms. Young's employment. At the time she was fired, Ms. Young was told that she was being terminated because she lied about why she was late for court. Ms. Coutee testified that she told Judge Fuselier at the meeting, after he told her that he did not write the letter to get Ms. Young fired, that the letter brought the situation to their attention but was not the reason for her termination. Ms. Coutee stated that Wal-Mart was firing her because she lied about why she was missing court. Nancy Butcher, legal counsel for Wal-Mart, stated in a letter to the Commission the following reason for Ms. Young's termination:
It is our understanding that Ms. Young was placed on suspension and later terminated not because of Judge Fuselier's letter, but because she failed to perform her job. Ms. Young's job would require her to testify on Wal-Mart's behalf in future shoplifting cases. As a result of this incident, Ms. Young's credibility could be called into question which would make it difficult to carry out the duties of her job.
Before the Commission, Judge Fuselier insisted that he believed Ms. Young had lied to court employees about why she was late for court:
... if you hear all of the tape, you hear that Louise Vice, the lady who worked for the Assistant District Attorney, and you hear the bailiff, Mr. Perkins, you hear them say that they had a telephone conversation with Lameia Young in which either she told them or she led them to believe that her supervisor, her supervisor was aware of the subpoena but her supervisor had told her go and install the cameras in Ville Platte, regardless of your subpoena. Well, as it turned out, that was not the case. So, Lameia Young wasif you hear the whole thing, I think you'll have the impression, and I certainly had the impression, that she was misleading the Court by passing the buck and putting the blame on her supervisor when, in fact, under cross examination she finally admitted "I'm sorry, my supervisor had *1265 nothing to do with this. I just simply forgot."
Judge Fuselier testified that he contacted Wal-Mart because he was concerned about the subpoena procedure at Wal-Mart and that, at the meeting, he indicated his desire that Ms. Young not be further punished, particularly that she not be fired, as a result of his letter regarding Wal-Mart's subpoena procedures.
Judge Fuselier's actions in holding Ms. Young in contempt of court and dismissing the criminal charges against Lamden are clearly legal rulings. In Quirk, this Court recognized the dangers of subjecting a judge to discipline because of an erroneous legal ruling, in that it "has the potential to trammel the exercise of judicial discretion and stifle the independence of the judiciary." 705 So.2d at 177. Consequently, we adopted the following standard to be applied in addressing whether a judge had committed legal error sufficient to the rise to the level of judicial misconduct:
a judge may be found to have violated La. Const. Art. V, Sec. 25 by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error.
Id. As recognized by the Judiciary Commission in its findings, Judge Fuselier's actions in finding Ms. Young in contempt of court constituted simple judicial error, not judicial misconduct, because he did not recognize that contempt order was inappropriate because there was no domiciliary or personal service as clearly required by La. C.C.P. art. 735. However, even though this ruling was not egregious nor made in bad faith, as will be seen from the rest of this opinion, we find that this ruling was made as part of a pattern or practice of legal error of failing to follow and apply the law.
The Commission further found that "ethical misconduct cannot be denied in considering that after the proceeding ended, Judge Fuselier took it upon himself to notify Wal-Mart of his dissatisfaction with Ms. Young and the events surrounding the dismissal of the Landen case." The Commission found that meeting with Wal-Mart and dismissing the Landen case convinced them that "Judge Fuselier cultivated relationships with the business community that were inappropriate, if not always ethically wrong, which produced the kinds of problems that ensued for both Ms. Young and for himself." The Commission rejected Judge Fuselier's contention that he was not seeking some discipline or other negative consequences to Ms. Young in light of the content of his letter to Wal-Mart, and found that even accepting this contention as true, it is ethically wrong for a judge to contact a party following conclusion of a trial to complain about one of the party's witnesses. Accordingly, the Commission found that he failed to follow the law and to maintain professional competence in it, and that he damaged public confidence in the integrity and impartiality of the judiciary, all in violation of Canons 2A and 3A(1). Further, the Commission found that he acted willfully in pursuing the issues surrounding Ms. Young after the trial had concluded, and that all of this proven conduct was public and brought the judiciary as a whole into disrepute, which further violated Article V, Sec. 25C of the Louisiana Constitution.
While we find that it was inappropriate for Judge Fuselier to have contacted Wal-Mart after the trial had concluded, we do not find that it was proven by clear and convincing evidence that the conduct was willful, that he was seeking some negative consequences for Ms. Young, or that *1266 it showed any partiality toward the business community, through Wal-Mart, given the fact that he was criticizing them for their employee's handling of the subpoena and that he dismissed the case against a defendant who had allegedly stolen goods from a Wal-Mart store. However, the record substantiates the Commissions's findings that, for whatever reason, he misrepresented to Wal-Mart what took place in his courtroom and, as a result, Ms. Young was fired. Accordingly, we find that Judge Fuselier violated Canons 2A and 3A(1) by holding Ms. Young in contempt of court, a legal error committed as part of a pattern or practice of legal error, and by misrepresenting to Wal-Mart that Ms. Young lied to him about why she did not appear in court, resulting in Ms. Young being fired.

Charges Nos. 0157, 0158, 0159 and 0169
On February 22, 1999, the Commission received a complaint from Judge Joel G. Davis of the 33rd Judicial District Court for the Parish of Allen.[16] These involved allegations that Judge Fuselier usurped the powers of the district attorney by instituting certain criminal prosecutions, violated the limits of his jurisdiction by sua sponte dismissing criminal charges and traffic citations, and engaged in misconduct in his handling of the collection of worthless checks. In the course of the investigation of Judge Davis' complaint, the Commission became aware that Judge Fuselier may also have engaged in impermissible ex parte communications. The Commission elected to investigate that issue on its own motion.

Charge No. 0157
In October 1995, during the Oakdale High School homecoming celebration, ten local teenagers were caught defacing private property with spray paint. The teens were arrested and issued citations to appear in Oakdale City Court on November 14, 1995 for arraignment on criminal mischief charges. When court was convened, the prosecutor was not available,[17] but nonetheless, Judge Fuselier arraigned the defendants, accepted guilty pleas from each of them, fined them $100 plus costs, and sentenced them to perform three days of community service. City of Oakdale v. Billard, No. S95-1496; City of Oakdale v. Marcantel, No. S95-1497; City of Oakdale v. Myers, No. S95-1498; City of Oakdale v. Jeziorski, No. S95-1499; City of Oakdale *1267 v. Strother, No. S95-1500; City of Oakdale v. Gordon, No. S95-1501; City of Oakdale v. David Johnson, No. S95-1502; City of Oakdale v. Michael Johnson, No. S95-1503; City of Oakdale v. Thornton, No. S95-1504; and City of Oakdale v. Giles, No. S95-1505, all on the docket of the City Court of Oakdale.[18] The Third Circuit Court of Appeal subsequently reversed the convictions and sentences, on the ground that (1) the charging instrument/affidavit was not filed in open court or in the office of the clerk as required by the Code of Criminal Procedure; (2) the records of the cases were devoid of any indication of participation by anyone on behalf of the State other than the trial judge; (3) the defendants were not represented by counsel, nor did they waive their right to counsel; and (4) the defendants were not fully advised of their rights prior to their guilty pleas. State v. Marcantel, 96-0048 (La.App. 3rd Cir.4/4/96).[19]
Before the Commission, Judge Fuselier agreed that his handling of the cases was "judicial error," but denied that it rose to the level of judicial misconduct:
I was placed between a rock and a hard spot. I had a duty to hold court. I had a decision to make on short notice. I did the best, very best that I could under the circumstances. I knew that when these people came in they were 17, when they informed me that they were 17 or 18and, quite frankly, I expected every one of them to enter a plea of not guilty and to hire a lawyer to represent them in this matter. I figured if they'd hire a lawyer they'd be found not guilty for various reasons because of the flaws in the system. To my surprise every one of them entered a plea of guilty. So, no, I did not spend a lot of effort advising them of their rights and appointing an attorney to represent them and so forth, no ma'am. It was a foregone conclusion, as I saw it, that this was going to be reversed. Was it judicial error? Yes, ma'am. Was it judicial misconduct? Absolutely not.
At the hearing, the Commission considered whether Judge Fuselier continued the practice of proceeding in criminal cases without the benefit of a prosecutor in a case involving Betty Gilbert, even after the court of appeal reversed and vacated the convictions of the defendants in the spray painting cases on the ground that a prosecutor must institute criminal charges.
In October 1996 (some six months after the Third Circuit's action in the spray painting cases), Ms. Gilbert wrote a worthless check payable to Buddy's IGA, processed by the Oakdale City Court.[20] When Ms. Gilbert failed to honor the check, Judge Fuselier issued a warrant for her arrest. Ms. Gilbert subsequently filed a motion to quash the charge of issuing worthless checks, which motion was based solely upon the allegation that "prosecution was not instituted by the District Attorney of Allen Parish or his designated assistant, nor by the City Prosecutor or his designated assistant. Apparently, prosecution in this case was instituted by the Trial Judge or his assistant." Judge Fuselier granted the motion to quash on March 31, 1997. At the hearing before the Commission, Judge Fuselier admitted that he *1268 did not associate the Third Circuit's action in the spray painting cases with his handling of the worthless check cases:
Q. You didn't take that to mean about the
A. About the checks
Q. D.A. institutes charges, not the Court or the Clerk?
A. You're referring to, like, applied the same thing to checks you mean?
Q. Right.
A. No. No, sir. I confess to you that I didn't. That didn't trigger that the same way as it did as far as arraignments.
We find these legal rulings were contrary to clear and determined law about which there is no confusion or question as to its interpretation.[21] However, while we do not find that these rulings were egregious or made in bad faith, again, they were made as part of the same pattern or practice of legal error that we find Judge Fuselier engaged in throughout this opinion, that of not following the law.[22] Therefore, the Court adopts the recommendation of the Judiciary Commission with regard to Charge No. 0157, and finds that Judge Fuselier's abused his judicial authority by conducting arraignments and accepting guilty pleas in criminal cases when no prosecutor was present, in violation of Canons 1, 2A and 3A(1).

Charge No. 0159
Charge No. 0159 alleged that Judge Fuselier engaged in impermissible ex parte communications by accepting requests to "fix" traffic tickets and/or other offenses, and having an employee of his court contact the district attorney's office or city attorney's office to relay the messages. The following evidence was presented at the hearing.
1. The case file in State v. Burns, No. 990233, contains the following handwritten note: "Judge. Tommy Burns is out frontwants to know if you could give him some help on this. 335-2420." In another handwriting are the words: "ask Todd [Nesom] to dismiss." In another handwriting are the words: "2-25-99 dismissed per Todd DL." "DL" refers to Delora Lovejoy, the Oakdale City Court Clerk of Court.
2. The case file in State v. Cole, No. 981434, contains the following handwritten note: "D.L. 9-23-98 Ask Todd if he w/ dismiss. PF."
3. The case file in State v. Darby, No. 981438, contains the following handwritten note: "D.L. Ask Todd if O.K. to dismiss if Judge gives Torry a `Warning.' PF 9-14-98."
4. The case file in City of Oakdale v. Ganey, No. 992092, contains the following handwritten letter addressed to Judge Fuselier from Mr. Faye Davis:
The lady that got the traffic tickets is name [sic] Barbara Ganey. She was charged not [sic] having a three year old in a child restaint [sic] and also her *1269 insurance had colasped [sic]. In the mean time the car is at OK Willis. She is presently unemployed and really hard up and needs to be with her two children. Do what you can for her.
The election is looking real good and everything seems in your favor.
Another handwritten note reads: "8-23-96 Mr. Davis (not T.J.) spoke to you about this." In a different handwriting are the words: "call Faye Davis + tell him continue until Oct. DL." Another handwritten note reads: "8-26-96 reset 14th per Judge DLsend notice of arrag."
5. The case file in State v. Goree, No. 98235, contains the following letter addressed to Judge Fuselier from Rapides Parish Sheriff William Earl Hilton:
As per our conversation of this date, enclosed please find proof of insurance on the above referenced. I certainly appreciate the help you gave me and I did admonish the party involved as you suggested.
Also in the case file is a handwritten note which reads: "D.L. 3-10-98 Warning. PF."
6. The case file in State v. Henderson, No. 98636, contains the following letter addressed to "Judge" at "City Court of Oakdale," from Avoyelles Parish Sheriff Bill Belt:
I would appreciate any assistance you may render on the above mentioned citation. Any assistance will be deeply appreciated.
Thanking you in advance and with kindest regards, I remain.
A handwritten note in the case file reads: "D.L. Notify Sheriff. Amend to non-moving + c.c. only PF 4-27." In the upper right hand corner of the note are the words: "Check w/ Todd N." In the lower right hand corner is the notation: "$74.00." On the front of the case file is the following notation: "4-27-98 Amend to non-mov + cc only per Judge DL." On the right hand side is the notation: "pd. 74.00 5-7-98."
7. The case file in State v. Johnson, No. 992153, contains a phone message slip addressed to "Judge" and dated "11/17." The caller is identified as "Carolyn W/Rep. Hill's off."[23] At the bottom of the slip are the handwritten words: "Linda P. Johnson speeding." Another handwritten note reads: "11-30-99 Judge, Todd dismissed. I thought you would prob. want to notify Carolyn. DL." Written in a different handwriting are the words: "I called her. PF."
8. The case file in State v. Jordan, No. 98461, contains the following handwritten note: "6-1-98 Jerry Chambelain's son thought it was taken care of. Bobby to talk to Alvin + get back w/ me. DL." Another handwritten note in the case file reads: "9-28-98 checked w/ Todd this is not dismissed. DL."
9. The case file in State v. LaFleur, No. 981020, contains the following handwritten note: "D.L. 7-6-98 Talk to Todd. PF." Another handwritten note reads: "A.P.S.O. Per 7-6-98 Sheriff dismiss per Judge."
10. The case file in State v. Longino, No. 98375, contains the following handwritten note: "req. Gerald Harrington."[24]
11. The case file in State v. Prejean, No. 98111, contains a letter from Marksville City Judge Angelo J. Piazza, III, dated January 23, 1998. The letter is addressed to Judge Fuselier, but directed to the attention of Delora Lovejoy. It states:
This letter is to confirm our conversation wherein we have requested an extension on the court date regarding Ms.

*1270 PreJean. My office will be sending a letter to Judge Fuselier via mail.
If we can be of any assistance in the future please don't hesitate to contact my office.
The case file contains a second letter from Mr. Piazza. This letter is dated January 27, 1998, and is addressed to Judge Fuselier. It reads:
Dear Perrell:
Please find enclosed a citation Ms. PreJean received in Oakdale. I have known Ms. PreJean for a number of years and I would deeply appreciate any assistance you may render regarding this matter.
If I can be of any assistance in the future please don't hesitate to contact my office.
12. The yellow traffic citation contained in the case file in State v. Reiners, No. 991103, has the following handwritten words across its face: "Dismissed per/ mayor's request."
13. The case file in State v. Runge, No. 98176, contains the following handwritten note: "D.L. 2-6-98 Ck. With Todd. PF."
14. The arrest report in the case file in State v. Sims, No. 98743, contains the following handwritten note: "See complaint. Judge Perrell Fuselier Recommend [sic] that she be charged as an Hobitial [sic] offender."
15. The case file in State v. Sonnier, No. 98886, contains the following handwritten note: "Kimplease call Bob at City Barn + let him know its [sic] been dismissed."
16. The case file in State v. Bobby Strother, No. 991071, contains the following handwritten note: "Chief of Police of Glenmora req-help."
17. The case file in State v. Edith Strother, No. 990445, contains the following handwritten note: "Judge3-24-99 This is George Edward Strother's wife. She is a school bus driver. Would you please help her with this ticket. Thanks Sally." At the bottom of the same note, in a different handwriting, are the following words: "Show this to Todd and ask him. This is." The rest of the note is missing.
18. The case file in State v. Washington, No. 98475, contains the following handwritten note: "D.L. 4-1-98 Tell Todd Rep. Hill req. Help. PF."
Before the Commission, Judge Fuselier explained that the references in the file to people asking for "help" meant, "Somebody had obviously contacted me or my Clerk. And I didn't make the decision to dismiss ... But the reason there is a reference on the front that says, `dismiss per Judge,' that's because I initiated the contact with my Clerk, who initiated contact with the Assistant D.A...." When asked who might have contacted him, Judge Fuselier replied, "The officer who wrote the ticket, the Police Chief, whoever called it to our attention, I don't know." Judge Fuselier defended his actions in these cases by telling the Commission he did not deem the kinds of communications described to be ex parte:
A. Ex parte communications to me means something that is intended to get to the merits of the case, or something that would affect the merits of the case. But when I'm notifying my clerk to contact Mr. Nesom about that, I do not regard that as ex parte communications.
Q. You wouldn't consider a dismissal of a criminal charge to be something getting to the merits of the case?
A. If I dismissed it, absolutely it would, but I'm not asking Mr. Nesom to dismiss. As you heard Mr. Nesom testify I have never asked Mr. Nesom to dismiss....
When asked whether he thought it was inappropriate for a judge to communicate with the assistant district attorney through the Clerk of Court about requests for dismissals *1271 or "help," Judge Fuselier responded:
No, ma'am .... if that is inappropriate, there is not, there is not any way to conduct or to run small rural city courts because those things, those things, those communications happen. I don't think they affect the outcome of the case any different than they would have been otherwise. If Mr. Nesom decides to prosecute, he does, if he decides not to prosecute, he doesn't prosecute. We, you know, we have to understand that we have to operate in the real world, you know, and we do our very best to be very ethical. We do our very best to be efficient. But if I, if I am improperly communicating with Mr. Nesom in this matter, then we cannot have any small City Court Judges sitting in the State of Louisiana because it's just, it's idealistic and it just doesn't exist.
In response to the question from a Commission member, "Why didn't you advise those people to go directly to the D.A. about getting a case dismissed rather than asking your Clerk to do it because you directly couldn't do it?" Judge Fuselier replied:
I did on a lot of occasions, ... But, you know, there are some that are, some that are in writing, some that are long distance phone calls that come from various people ... and then the Mayor of Alexandria or Lake Charles calls and says, "By the way, my next door neighbor or my daughter is going to school at McNeese in Lake Charles and got arrested,... can you help me?" Well, it would be not only bad manners, but unrealistic to say "I'm sorry, Mayor, I've known you since we were in law school together at Tulane, but I can't speak to you about this at all." ... I'm not gonna tell him, "No, I'm not going to call." You know, I would call [the prosecutor] and say, "Look, the Mayor called," or something like that, "You have to take action. But out of courtesy, just out of respect, he called, I'm telling you he called, would you please call him back and y'all take care of your business." That's how I would handle it. If that's misconduct or improper ex parte communications, ... I think that's the real world.
The Commission alleged that Judge Fuselier's conduct violated La. Const. art. V. Sec. 25(C) and Canons 1, 2A, and 3A(6).
Ex parte communications can "suggest bias or partiality on the part of the judge" and "[a]t worst, ex parte communication is an invitation to improper influence if not outright corruption." Jeffrey M. Shaman et al., Judicial Conduct and Ethics, Sec. 5.01 (3rd ed.2000). The conclusion that Judge Fuselier's many private communications were improper is bolstered by the decisions of other states in similar cases. The Supreme Court of California removed a judge from the bench for, among other things, calling the district attorney assigned to a criminal case docketed to his court ex parte and urging him to prosecute the defendant on a felony version of the charge. Ryan v. Commission on Jud. Perf., 45 Cal.3d 518, 247 Cal.Rptr. 378, 754 P.2d 724, 733 (1988). The Ryan Court found the judge's conduct constituted willful misconduct, despite the fact the district attorney did not follow the judge's suggestion and the judge had no further contact with the case. Id.; see also Mississippi Comm'n on Jud. Perf. v. Chinn, 611 So.2d 849, 850 (Miss.1992) (removing a judge from office for, among other things, engaging in ex parte proceedings with defendants whose traffic violations were still pending before him).
In Mississippi Comm'n on Judicial Performance v. Chinn, the Mississippi Supreme Court rejected a respondent judge's argument that he could not avoid ex parte communications:

*1272 This Court realizes that it is difficult not to have ex parte communications because judges do not know the nature of their calls when they answer the phone. However, this problem can be alleviated by using clerks to screen calls, inquiring whether they pertain to a matter presently pending before the court. If so, the call could be directed to the county attorney, thereby avoiding any ex parte communications.
We acknowledge that requests for "help" may be submitted to judges in both rural and urban areas and that judges may have a difficult time avoiding them. However, a judge is forbidden from accepting requests for help, and from passing these requests along to the prosecutor. By accepting these requests for help and passing them along, Judge Fuselier cultivated an atmosphere where people believed Judge Fuselier was open to such requests and that they could gain an advantage by contacting the judge privately. Further, the prosecuting attorney, who was contacted by Judge Fuselier, may have felt pressured into doing what he suggested, knowing that Judge Fuselier would be presiding in many other cases he prosecuted. Judge Fuselier's defense that it was his clerk, and not him, who actually contacted the prosecutor about the requests for help is no defense at all, as everyone knew the information was coming from Judge Fuselier. Finally, Judge Fuselier testified that "on a lot of occasions" he simply referred the caller to the district attorney's office, which shows his recognition that that was the proper procedure. Therefore, we agree with the recommendations of the Judiciary Commission regarding Charge No. 0159 and find that Judge Fuselier violated Canons 1, 2A, 3A(6) and La. Const. art. V, Sec. 25(C).

Charge No. 0160
Sometime in 1994, in response to requests of local business and civic groups in Oakdale, Judge Fuselier instituted a court program for collecting worthless checks (checks returned for insufficient funds, or checks written on a closed bank account). More than thirty merchants and other organizations participated in the worthless check program until it was discontinued by Judge Fuselier in November 2001.[25] As of February 2001, there were approximately 5,093 closed and 538 open worthless check cases in Oakdale City Court, with some 100 new cases added each month.
Under Judge Fuselier's program, merchants were instructed to bring worthless checks to the Oakdale City Court Clerk of Court. An employee of the clerk's office then prepared a demand letter on Oakdale City Court stationery that was mailed to the maker of the check by certified mail.[26] The form letter demanded payment of the check, plus a $15 collection fee,[27] within ten days.[28] If the maker of the check failed to pay the amount of the dishonored check *1273 and the collection fee within the allotted time, the deputy clerk of the Oakdale City Court prepared an arrest warrant for Judge Fuselier to sign. The arrest warrant was supported by a probable cause affidavit containing a facsimile signature of the applicable merchant, which facsimile signature was applied with a rubber stamp by the court's staff without any independent review by the merchant.[29] After a warrant was issued in a worthless check case, the maker of the check was obliged to pay the court the amount of the dishonored check, the collection fee, a fine of $15 to $35 ($15 for checks dishonored because of insufficient funds and $35 for checks dishonored because the account had been closed), and court costs of $68 to $89, before Judge Fuselier would recall the arrest warrant. From 1994 to February 7, 2001, Judge Fuselier issued numerous warrants for arrest on a criminal charge of issuing a worthless check in violation of La. R.S. 14:71, and persons were actually arrested as a result.[30]
Judge Fuselier arranged at least three meetings with the participants in the worthless check program to discuss improving the court's success rate in collecting on "bad checks." At one such meeting on October 30, 1997,[31] Judge Fuselier promised to be strict with persons who had not paid their checks, including his promise to keep one person in jail: "I intend to win the tug of war: You will pay or else you'll stay in jail.... There are 27 of them out of the 456 who have served time in jail." Judge Fuselier went on to point out to the merchants how much money he had collected: "Plus, if you figure a $26.00 average, you can just put that money right back in your cash registers that's been taken out, and, for that, we'd likewe'd like toThat's how we've been a service to you."
Judge Fuselier continued to collect worthless checks even after the district attorney expressed his opinion that it was inappropriate for the court to do so. Allen Parish District Attorney Douglas L. Hebert, *1274 Jr. confirmed that he met with Judge Fuselier several years ago and told the judge that he did not think a judge should undertake the worthless check collection program:
I expressed my belief [to Judge Fuselier] that it was inappropriate for the City Court to take any action that could be construed as that of an advocate. I had some concerns about that primarily based upon the notation (sic) that someone could get one of these letters and have a feeling that perhaps there had been, you know, maybe some prejudging or something like that with respect to the court.
My personal philosophy is that we need to keep the roles separate. I just think the system works better like that as a general proposition. If the prosecutor does his job, and then the judge does his job, and the appeals courts do their job, the whole system works better.
And it was my belief that to the extent that the judge was acting as an advocate, that he was going beyond the boundaries of that which appropriately should be done by the judge, who should really wait and make decisions when information is presented to him in the ordinary course of events.
Mr. Hebert opined that Judge Fuselier didn't necessarily disagree with these comments, but "he didn't really perhaps see that he was crossing over that line in so doing it." Further, Judge Fuselier went on to ask Mr. Hebert if the Oakdale City Court could use the district attorney's letterhead for the demand letters, but Mr. Hebert refused. He further testified that he disagreed with the worthless check program because it was missing one of the elements essential to checks and balances in the system, i.e., the prosecutorial discretion of screening cases ahead of time.
Judge Fuselier's attorney questioned Mr. Hebert about why he didn't make an issue of Judge Fuselier's worthless check collection program. Mr. Hebert testified in relevant part:
Q. And despite your honest difference of opinion with Judge Fuselier, you were never sufficiently concerned or concerned enough about what was going on that you felt it necessary to take over those worthless check prosecutions, right?
A. That's correct. Perhaps a little geographical perspective would be helpful to this inquiry and to the position that I have taken, and, quite frankly, the position that Judge Fuselier took some time back.
Allen Parish is a rural area that has a mason dixon line running right straight through it. Oakdale in the northern part of the parish ... I don't know really how to say this, except that there's a considerable difference between the north end and the south end of the parish.
People in Oakdaleand you have to understandand I think that Allen Parish is probably the only one like this. The parish [seat] is in a town called Oberlin, which is the third largest town in the parish. Oakdale being the largest.
Most of the activity that happens happens in Oakdale. People in Oakdale really believe that the parish seat ought to be in Oakdale, not in Oberlin in the first place, because it's such a little bittythere's nothing in Oberlin besides things to do at the courthouse. People in Oakdale do not like to go to Oberlin unless they just have to.
When this thing first came up, quite frankly, I toyed with the notation [sic] of just putting my heels to the ground and saying, no, I'm going to force these people in Oakdale to come to Oberlin. I didn't do it for a lot of reasons. Part of it is political, without a question. The other is because of that longstanding *1275 tradition about the way the people in Oakdale view the south part of the parish. It would have created all kinds of problems if I said you just have to come here.
In retrospect should I have perhaps done differently. Yeah. Maybe we wouldn't be having as much of a problem here that we're now having. But the fact of the matter is I didn't and just sort of let it happen because it was providing a service to the City of Oakdale.
In addition to the geography issue and the "political realities" in Allen Parish, Mr. Hebert conceded that the situation was further complicated by "a city prosecutor who don't do nothing [sic]." Nevertheless, he added, "[t]hat does not change my opinion that I think that fundamentally ... any courts should be ever in a position where they're operating as an advocate."
Before the Commission, Judge Fuselier testified that he started the worthless check collection program to benefit his constituents, both the merchants and the makers of the bad checks:
I was handling this matter, not [just] for the merchants, for all of the citizens of Ward 5 with[in] Allen Parish. The merchants and the Lions Clubs and the City of Oakdale and any private individual who may have been the victim of a check that was dishonored by the bank, if they wanted to have it collected then we would make an attempt to collect it as a civil matter to avoid having somebody charged with a crime, have them arrested. If that failed, then it converted, or it was transformed into a criminal proceeding.
Judge Fuselier testified that no one ever raised a single objection to the operation of the court's program for collecting worthless checks. Indeed, Judge Fuselier proudly mentioned "one or two newspaper articles that were written complementing the entire success of the program."
Judge Fuselier told the Commission he thought the Oakdale City Court was authorized to collect dishonored checks because La. R.S. 14:71[32], according to Judge Fuselier's interpretation, authorizes justices of the peace to operate such collection practices. Judge Fuselier testified specifically:
I would say there is not any precise language in that section that says a City Court can [send out demand letters on worthless checks for merchants], but I would add, and I think it's a very important but, whatever a justice of the peace court can do, certainly a City Court, which has much greater jurisdiction than a justice of the peace, has authority to do that, too. So, if a justice of the peace can send out a letter, I certainly believed at that time and still believe that a City Court can, particularly if a collection agency can, particularly if a lawyer in private practice can, or a next-door neighbor can....
The Commission was "astounded" by this argument, "finding it to be evidence that he fails to comprehend that occupying the judicial bench, with all its attendant powers, necessarily means the judge himself must observe heightened standards of conduct." It further recognized that "there are many things that Judge Fuselier's next-door neighbor can ethically do *1276 that Judge Fuselier cannot do because he is a judge."
We agree with the Judiciary Commission's recommendations regarding Charge No. 0160. Judge Fuselier's role in instituting, authorizing, and participating in the court's worthless check program created the appearance of impropriety, was an abuse of his constitutional judicial authority, and caused him to engage in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute. His belief that he could handle worthless checks as "civil" matters at the demand letter stage and convert the process to "criminal" if payment did not occur was erroneous. A court's handling of worthless checks is confined to following statutory criminal law. Further, by instituting the bad check program, Judge Fuselier stood in the shoes of the check recipient in trying to collect the checks, which disqualified him from presiding over any case based on those checks or involving those parties. Judge Fuselier's impartiality could reasonably be questioned when he adjudicated the cases where the checks were not paid, a clear violation of Canon 3C. Further, persons who received demand letters and could not pay surely believed they were unlikely to be treated neutrally and fairly as their cases proceeded through the very court that initiated collections against them, in violation of Canons 1 and 2A, as well as La. Const. art. V, Sec. 25C.
Finally, Judge Fuselier should have clearly understood that an affidavit of probable cause, which says on its face that the affiant appeared to provide facts sufficient to support arrest, means what it says. To use facsimile signatures on behalf of the merchants so that they would be spared the inconvenience of executing proper affidavits creates the very risk that affidavits of probable cause where designed to eliminate, i.e., that innocent people would be detained and arrested. In these cases, persons could have paid the check after they realized their mistake or received the demand letter, yet the court would not be aware of this because the merchant did not appear the day the affidavit was executed and attest to the fact that the check was not yet paid. Judge Fuselier's institution and administration of the worthless check program meets the requirements enunciated in Quirk, in that they are legal rulings made contrary to clear and determined law about which there is no confusion or question, and, while not made in bad faith, they were made as part of a pattern or practice of legal error. In this regard, Judge Fuselier violated Canons 1, 2A, 2B, 3A(1) and 3A(4), as well as La. Const. art. V, Sec. 25C.

Other Conclusions
With respect to the prior complaints lodged against Judge Fuselier[33], the Commission noted a pattern and practice *1277 of the judge's exceeding his judicial authority. Indeed, the Commission felt Judge Fuselier has completely abandoned his role as a neutral arbiter. The Commission *1278 observed that these issues have been raised with Judge Fuselier in the past, but that he has not learned from the prior warnings. Considering that fact, and having found that the record overwhelmingly demonstrates that Judge Fuselier's conduct as set forth in the proven formal charges was in violation of the Louisiana Code of Judicial Conduct and the 1974 Louisiana Constitution, the Commission concluded that a recommendation of judicial discipline is appropriate in this case.

DISCIPLINE:
Because we find Judge Fuselier was guilty of judicial misconduct under both the Code of Judicial Conduct and the Louisiana Constitution, we now turn to the question of discipline. In In re Chaisson, we adopted the following non-exclusive list of factors to consider in imposing discipline on a judge:
To determine the appropriate sanction, we consider the following nonexclusive factors: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
549 So.2d 259 (La.1989).[34] Applying these factors, we find that a 120-day suspension, without pay, as well as the *1279 imposition of costs in the amount of $8,862.42, as recommended by the Judiciary Commission, is appropriate in this case.

DECREE
For the reasons stated herein, it is ordered that Judge Perrell Fuselier of the City Court of Oakdale, State of Louisiana, be suspended from judicial office for one hundred and twenty (120) days without pay. It is further ordered that Judge Perrell Fuselier be ordered to reimburse and pay to the Judiciary Commission costs in the amount of $8,862.42 incurred in the investigation and prosecution of his case, pursuant to Supreme Court Rule XXIII, Section 22.
WEIMER, J., concurs in part & dissents in part and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
KIMBALL, J., dissents and would impose greater discipline.
JOHNSON, J., concurring in part, dissenting in part.
I agree with the majority's findings regarding judicial misconduct. However, I disagree with the discipline imposed. I would order that Judge Fuselier be removed from the bench.
In my mind, Judge Fuselier's conduct is indistinguishable from that this Court examined in In re Judge Larry D. Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181. In that case, Judge Jefferson was charged with multiple violations of the code of Judicial Conduct, including, inter alia, exceeding and/or abusing his contempt power for holding the City Prosecutor and Clerk of Court in contempt, and for abusing and exceeding his authority as a judge by banning the City Prosecutor for his courtroom and subsequently dismissing forty-one cases. The Judiciary Commission recommended that Judge Jefferson be removed from the bench, and this Court agreed by order the judge' removal from the bench and declaring his office vacant.
In the instant case, Judge Fuselier held a witness in contempt for failure to appear in court. Thereafter, he contacted and met with the witness's employer, which ultimately led to the termination of the witness's employment. The majority agrees that Judge Fuselier violated the *1280 Code of Judicial conduct by contacting the witness's employer and misrepresenting to them what had actually taken place in the courtroom. The majority also agrees that Judge Fuselier abused his judicial authority by conducting arraignments and accepting guilty pleas in criminal cases in the absence of a prosecutor and by dismissing misdemeanor traffic cases without involving the prosecutor. Additionally, the majority agrees that Judge Fuselier violated Judicial Canons by with engaging in impermissible ex parte communications by "fixing" traffic tickets and/or other offenses, and that he abused his constitutional judicial authority by "instituting, authorizing, and participating in" the worthless check program. Yet, astonishingly, the majority concludes that a 120-day suspension is appropriate in this case.
In my mind, Judge Fuselier's conduct was even more egregious than that of Judge Jefferson. Accordingly, I believe that the same discipline, removal from the bench, is warranted.
WEIMER, J., concurring in part and dissenting in part.
I agree with the result and the majority opinion except as follows.
Given the totality of the circumstances surrounding the Ms. LaMeia Young incident, which includes inconsistencies in the statements and testimony of Ms. Young, I would not find a violation relative to that matter. Although it is inappropriate to find one in contempt where there was no domiciliary or personal service as required by La.C.Cr.P. art. 735, this ruling was not egregious or made in bad faith. Because this incident was separate and distinct from other matters, I would not find this to be a pattern or practice of legal error involving the failure to follow and apply the law.
NOTES
[1] Canon 1 provides:

A Judge Shall Uphold the integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
[2] Canon 2A provides:

A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
[3] Canon 3A provides:

A Judge Shall Perform the Duties of Office Impartially and Diligently
The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities
(1) A judge shall be faithful to the law and maintain professional competence in it. A judge shall be unswayed by partisan interests, public clamor, or fear of criticism.
[4] Canon 2B provides in pertinent part:

A judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge....
[5] Canon 3A(4) provides:

A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, and shall not permit staff, court officials or others subject to the judge's direction and control to do so.
[6] Canon 3A(7) provides:

A judge shall dispose of all judicial matters promptly, efficiently, and fairly.
[7] Canon 3A(6) provides in pertinent part:

Except as permitted by law, a judge shall not permit private or ex parte interviews, arguments or communications designed to influence his or her judicial action in any case, either civil or criminal.... Where circumstances require, ex parte communications are authorized for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits, provided the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication. A judge shall not knowingly accept in any case briefs, documents or written communications intended or calculated to influence his or her action unless the contents are promptly made known to all parties.... Similar circumspection should be exacted on the part of court officers, clerks and secretaries.
[8] Canon 3C provides:

Recusation. A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.
[9] Canon 5C(1) provides:

Financial Activities.
(1) A judge shall refrain from financial and business dealings that tend to reflect adversely on the judge's impartiality, interfere with the proper performance of judicial duties, exploit the judge's judicial position, or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves.
[10] A majority of the Commission determined that the allegations set forth in Charge No. 0158 were not proven by clear and convincing evidence. The gravamen of that charge was that Judge Fuselier exceeded his judicial authority by consistently dismissing misdemeanor traffic cases without the involvement of a prosecutor. The Office of Special Counsel introduced into evidence files containing numerous handwritten notes which said (either precisely, or in similar language), "Dismissed by Judge." The Oakdale City Court Clerk of Court, Delora Lovejoy, insisted in her testimony before the Commission that these notes were internal, made without the input of Judge Fuselier, and indicated merely that the judge had gotten a request for a dismissal. After receiving such a request, Ms. Lovejoy, or one of her staff, then contacted the Assistant District Attorney, or City Prosecutor, as the case may have been, and relied upon his decision whether or not to dismiss the cases. Assistant District Attorney Todd Nesom's testimony confirmed in substantial part Ms. Lovejoy's testimony concerning the procedure for these dismissals. Consequently, a majority of the Commission did not find the requisite clear and convincing evidentiary standard to have been satisfied.
[11] Various witnesses testified that Mr. Davis did not always perform his job as would be expected, which created significant problems for Judge Fuselier. For example, Judge Fuselier occasionally conducted court "without a city prosecutor on city ordinances," because "the [city] prosecutor wouldn't show up." Mr. Davis also failed to appear for arraignments. This was confirmed by both the Allen Parish District Attorney and the Oakdale City Court Clerk of Court. Nevertheless, Judge Fuselier admitted that he has never held Mr. Davis (or indeed, any attorney) in contempt of court. Judge Fuselier testified to the Commission that he thought it would "cause some turmoil in the community" if he held Mr. Davis in contempt of court.
[12] The subpoena was delivered to the Oakdale Wal-Mart store by a sheriff's deputy, but because Ms. Young was not on the premises at the time, it was simply left there for her (the court's bailiff, Wilburn Perkins, confirmed that this is a common practice). A store employee later telephoned Ms. Young to tell her that the subpoena had been delivered.
[13] Ms. Young cleaned the toilets at the Oakdale city jail to satisfy her community service obligation.
[14] The letter was addressed to the vice-president of Wal-Mart, who was located in Bentonville, Arkansas, and read as follows:

Gentlemen:
When I was elected City Judge almost eight years ago, I promised the merchants that I would strictly enforce the law against shoplifters. In an effort to reduce the amount of shoplifting in our community, I impose mandatory jail sentences of ten to thirty days in the Oakdale City Jail for those who are found guilty or plead guilty of shoplifting. As a result of this philosophy, shoplifting in our community has been reduced considerably during the last few years.
Wal-Mart is a valuable assert to our community and it is the most frequent victim of shoplifting. Many people have been charged and tried for shoplifting in the Wal-Mart Store located in Oakdale, Louisiana. On each occasion when the case went to trial, a "Loss Prevention Representative" testified as an important witness to the shoplifting.
Last Monday, October 26, 1998, the "Loss Prevention Representative" was scheduled to testify about a person who was charged with shoplifting in the Wal-Mart Store in Oakdale. This Loss Prevention Representative, Lameia Young, had received a subpoena at the Oakdale store and she admitted that she was aware of the trial scheduled for Monday evening. When her name was called, she was not present. My court personnel were able to locate her by telephone where she was working that evening in Ville Platte, Louisiana. She was ordered to report as soon as possible to the Oakdale City Courtroom. I delayed the commencement of the trial for forty-five minutes because she indicated she could be here within that period of time. We started the trial approximately fifty minutes later and she was still absent. The defense lawyer moved for dismissal of the charge, and I granted his motion.
A few minutes after the charge had been dismissed, Lameia Young arrived and I put her on the witness stand. She admitted that she knew about her subpoena, but she "forgot" to appear. I explained to her that simply forgetting about a subpoena to appear in court is not an excusable matter, particularly for the "Loss Prevention Representative" who is basically serving in a law enforcement capacity for Wal-Mart Stores. I imposed a fine upon Ms. Young and ordered her to do community service for her violation.
I write this letter to you because I believe that ignoring a subpoena is a serious offense. This court has adopted a strict philosophy about shoplifting, and I was disappointed when Wal-Mart's "Loss Prevention Representative" took a rather casual attitude about a subpoena to appear in court. Hopefully you will take this opportunity to instruct your Loss Prevention Representatives, Store Managers, and other appropriate personnel, that subpoenas to appear in court are matters that must be taken seriously. Additionally, meticulously honoring subpoenas to appear in court promotes cooperation between the Court and the Wal-Mart Store in discouraging further shoplifting.
I wish to point out that I do not fault Nancy Fletcher, Manager of the Oakdale Store, for the failure to the "Loss Prevention Representative" to appear in court. In fact, the Manager of the Oakdale Store is a shining example of enthusiasm, cooperation, and dedication. She has been a valuable assert to this store and also to this community since her arrival approximately two years ago.
Sincerely,
Perrel Fuselier
City Judge
[15] According to a written statement provided by Ms. Vice:

I called Ville Platte and spoke with Ms. Young. I asked her did she know she was supposed to be in court at 5:30 for a trial. She said yes, but that her supervisor had told her she must install some cameras in the Ville Platte store tonight and that was what she was doing. I did advise her that subpoena took priority and that she needed to get here as quickly as possible. She advised that she would be there in forty-five minutes.
Ms. Young did not actually state to me that her supervisor had told her not to come to court. All she said was I was told by my supervisor to install these cameras tonight.
[emphasis added]. This statement was submitted to the Office of Special Counsel by Judge Fuselier as an attachment to his response to Ms. Young's complaint.
[16] Judge Fuselier's defense to several of the formal charges included his harsh criticism of former City Prosecutor T.J. Davis. However, the Commission found that the alleged failure of Mr. Davis to perform his prosecutorial duties was relevant only to Charge No. 0160, and had no bearing on Judge Fuselier's conduct in Charge Nos. 0156, 0157, or 0159. Notwithstanding, the Commission did not believe that Mr. Davis' inaction excuses Judge Fuselier's conduct; rather, to some extent, such inaction was considered in mitigation when the Commission formulated the recommended penalty.

In addition, Judge Fuselier's counsel elicited testimony to the effect that Mr. Davis' son, Judge Joel Davis, is one of the complainants in this matter. That there may be negative feelings between the Davis family and Judge Fuselier, or that Judge Davis may have had a political motivation in lodging the complaint, became irrelevant to the Commission when it became evident that the allegations of the complaint were probably true in some respects. Accordingly, in this case, the Commission deemed the relationship between Judge Fuselier and the Davis family to be irrelevant to its findings and recommendation herein.
[17] Allen Parish District Attorney Douglas Hebert told the Commission these were not cases in which his office declined to bring charges, but rather, "We had no idea that [prosecution] was even taking place when it was taking place." Assistant District Attorney Todd Nesom apparently had a scheduling conflict and could not be present for the arraignments.
[18] The "City of Oakdale" caption is incorrect. Because each of the defendants was charged with a violation of a state statute, the caption should have read "State of Louisiana" versus the defendant.
[19] Consolidated with the Marcantel case were the cases involving Daron Billard, Chad Gordon, Michael Johnson, Cliff Myers, Lee Jeziorski, Heath Strother, and Andrea Giles. Two of the defendants, David Johnson and Jimmy Thornton, did not appeal their convictions and sentences.
[20] See the discussion regarding Charge No. 0160.
[21] La. Const. art. Sec. 26(B) reposes in district attorneys or their designees every criminal prosecution by the state in his district. La. C. Cr. Pr. Art. 61 states, "the district attorney has the entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Further, La. R.S. 16:3 provides, "the district attorneys throughout the state shall represent the state in all criminal prosecutions before city courts constituted by law."
[22] We recognize that the vandalism cases were reversed by the Third Circuit on appeal because of Judge Fuselier's error of law and Judge Fuselier dismissed Ms. Gilbert's case on a motion to quash, thus any damage done by his actions was corrected through the judicial process. We further recognize that none of the defendants in these vandalism cases complained to the Judiciary Commission about Judge Fuselier's conduct in these cases.
[23] Mr. Herman Ray Hill is a member of the Louisiana House of Representatives.
[24] Mr. Gerald Harrington is the Clerk of Court for the 33rd Judicial District Court.
[25] Judge Fuselier discontinued the worthless check collection program "out of respect for this proceeding," but he testified that to this day, he knows of no prohibition against what he was doing.
[26] Some of the demand letters cited La. R.S. 16:15, which authorizes a district attorney to collect a fee when his office collects and processes an NSF check. Other letters omitted reference to the district attorney's authority. Judge Fuselier conceded that the citation to the statute was "incorrect."
[27] Of the $15 fee, $5.30 was paid to the merchant and $9.70 was retained by the court. In August 1999, the collection fee was increased to $25 (of which the court retained $19.70), and the maker of the check was afforded 15 days to make good on the check and the fee.
[28] If the bad check was written on a closed account, the maker was not permitted to simply pay the checkhe or she had to appear in court to resolve the matter.
[29] The participants in the worthless check program authorized court personnel to have facsimile signatures prepared, and then reimbursed the court for the cost of the rubber facsimile stamp. Judge Fuselier testified that the individuals who used the rubber stamps had specific authority from the merchants to do so:

[A]s you know we had a pretty serious worthless check problem in Oakdale, and some of the merchants were having to come to court twice a week, or three times a week, or four or five times in two weeks, you know, and they were looking for a way to make it more efficient. And we wanted to try to find a way that made the administration of justice more efficient as well.
Defending his use of facsimile signatures in the worthless check collection program, Judge Fuselier pointed out that facsimile signatures are acceptable in other situations, and that "by analogy," he thought it was acceptable for him to use them, as well. For example, he noted that the Clerk of Court for the City of Kenner may use a facsimile of the signature of the prosecuting attorney to affix the prosecuting attorney's signature to bills of information in the Mayor's Court for the City of Kenner.
[30] In certain of the NSF check cases, Judge Fuselier obtained or authorized others to obtain credit reports for the person to whom a demand letter was mailed. The credit report was then made a part of the court file. Judge Fuselier testified his primary purpose in obtaining the credit report was to verify "the address that we had for that particular defendant or that particular worthless check issuer." Judge Fuselier further testified that he thought "it's authorized under the law for that purpose."
[31] An audiotape was made of Judge Fuselier's meeting with the merchants on October 30, 1997. Both the original audiotape and a transcript of the meeting were introduced into evidence at the hearing by the Office of Special Counsel.
[32] La. R.S. 14:71, the statute defining the crime of "issuing worthless checks," states in pertinent part:

G. In addition to any other fine or penalty imposed under this Section, the court shall order as part of the sentence restitution in the amount of the check or checks, plus a fifteen dollar per check service charge payable to the person or entity that initially honored the worthless check or checks, an authorized collection agency, or justice of the peace.
[33] PRIOR COMPLAINTS AGAINST JUDGE FUSELIER:

The Commission reviewed in the present proceeding the following prior complaints lodged against Judge Fuselier:
1. On October 28, 1992, the Commission issued a letter of counseling to Judge Fuselier concerning his conduct in two separate matters.
a. In file No. 92-57, the Commission received a complaint from Dr. George B. Mowad, who was then the Mayor of Oakdale, that Judge Fuselier "is acting as investigator, police, judge, God, King and ruler." Dr. Mowad detailed several actions by Judge Fuselier which were more in keeping with the duties of the police or a district attorney than with those of a judge, including an allegation that "the Judge drives the street late at night and on one occasion went into a bar in a black area of town after midnight and told them that they would have to close because it was after closing hour." In Judge Fuselier's response to Dr. Mowad's complaint, he stated that "in an effort to be informed about the high crime areas of our community, I have on various occasions driven around in our community during the daytime and at night to observe the activities and the persons who are repeatedly in or near the high crime areas.... I have visited our police sub-station and our regular police station during the day time, night time, and on weekends."
b. In file No. 92-70, Mrs. Burton Fontenot alleged that Judge Fuselier contacted the police and her insurance company after she and her husband were involved in an accident, even though she never spoke with the judge or retained him as her attorney. In Judge Fuselier's response to Mrs. Fontenot's complaint, he admitted he had visited the Ville Platte Police Department and obtained a copy of the accident report and had instructed his secretary to obtain insurance information on the driver who had struck Mr. and Mrs. Fontenot in the accident.
On October 28, 1992, Hugh M. Collins, Ph.D., the Chief Executive Officer of the Judiciary Commission, wrote to Judge Fuselier on behalf of the Commission:
The Commission wishes to counsel you to be ever cognizant of the Constitutional provisions of separation of powers and to leave nonjudicial functions to the appropriate authorities. The Commission is seriously concerned about your activities and is prepared to refer back to them if similar conduct occurs in the future.
2. In file No. 94-263, the Commission received a complaint concerning Judge Fuselier's handling of a juvenile matter. In particular, Judge Fuselier failed to convene the appropriate hearings required by the Children's Code in a child in need of care case, and failed to appoint counsel to represent the children alleged to be in need of care. On August 16, 1994, the Commission voted, with strong reservations, to close the matter with a letter of warning to Judge Fuselier:
The Commission has requested, however, that I convey to you as strong a warning as possible concerning your court's apparent failure to consistently follow the dictates of the Children's Code.
* * *
Based upon the Commission's investigation it is the Commission's position that your failure to adhere to the Children's Code, in the Longino matter, was not an isolated occurrence and has been a pervasive practice of your court. Therefore, the Commission intends to monitor the situation and, if further complaints are received alleging substantially similar violations of the Children's Code, the Commission will then proceed with formal charges against you.
3. On March 25, 1997, the Commission issued a letter of warning to Judge Fuselier in file No. 96-491 for accusing an election commissioner of lying in a hearing and for becoming abusive towards her. The letter stated:
The Commission issues this letter of warning to you that, as a judge, you must observe high standards of conduct and act at all times in a manner that promotes public confidence in the judiciary. In that regard, I enclose a copy of the Louisiana Code of Judicial Conduct for your serious study, with particular focus on Canons 1 and 2. Should there be further complaints filed against you, please be aware that pursuant to Louisiana Supreme Court Rule XXIII, Section 3(d), the Commission may refer to the present matter in those proceedings.
4. On June 26, 1998, the Commission closed file No. 98-1031 and admonished Judge Fuselier for his conduct in writing a letter of recommendation on behalf of a convicted sex offender:
At a recent meeting the Judiciary Commission considered the ethical issues presented by your writing a letter of recommendation to the BESE Board on behalf of Mr. Tommy Schexnayder, as reported in the Baton Rouge Advocate newspaper. You indicated in your response to the inquiry of Special Counsel Steven R. Scheckman about this complaint that you realized that you exercised poor judgment in sending such a letter. The Commission voted to close this file with an admonishment to you that your conduct was in violation of Canon 2B of the Code of Judicial Conduct.
In the future, if you are faced with a question about the proper course of ethical judicial conduct, do not hesitate to contact this office, and we will do our best to put you in touch with someone who can assist you in reaching a decision that is consistent with the canons of the Code.
[34] In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson and concluded as follows:

(A) and (B) The evidence adduced at the hearing considered in the context of prior complaints demonstrates a pattern and practice of exceeding judicial power and failing to act as a neutral arbiter. Due regard given to the setting of city courts in general, the Commission believes that Judge Fuselier's conduct was far outside permissible limits and was egregious, particularly in the case of Ms. LaMeia Young. Notably, there are four different charges upon which the Commission would recommend a sanction if each were standing alone, and the fact of numerous prior complaints cannot be ignored.
(C) and (D) Judge Fuselier's actions occurred in the performance of his judicial duties. With regard to two charges, Nos. 0156 and 0157, the conduct occurred in the courtroom.
(E) Judge Fuselier admitted to many of the facts found by the Commission. These admissions are deemed of no consequence, however, because Judge Fuselier either insisted that he fell prey to innocent error or that the "real world" necessitated his actions.
(F) Judge Fuselier testified that he discontinued implementation of the "worthless check" service called into question by the formal charges and that he will resume the program only if this court determines that it is permissible for him to do so. Notably, however, he only discontinued the program in November 2001, two to three months shy of his February hearing, not when he first had notice of the problem from the Commission and not in July 2001 when the formal charges were filed.
(G) Judge Fuselier assumed the bench in January 1991, and thus was a seasoned judicial officer when the facts giving rise to the formal charges occurred.
(H) There have been no prior complaints to the Commission about the judicial conduct of Judge Fuselier that have resulted in formal charges, but there have been prior complaints about conduct that suggests Judge Fuselier exceeded his role as a neutral arbiter, as previously noted.
(I) Judge Fuselier's conduct has seriously undermined the reputation of the judiciary as a whole. The case of Ms. LaMeia Young tells the public that a judge can hold a person in contempt of court even though that person was not legally bound to comply with a subpoena, and then the judge can reach beyond the court to the person's employer resulting in her losing her job. Charge No. 0157 exhibits to the public the attitude that a judge can ignore the prosecutorial function, performing it himself. Charge No. 0159 demonstrates that a person can contact the judge directly for a "fix," and the conduct in Charge No. 0160 illustrates that a judge can assume the function of advocate for one party, then adjudicate the dispute between those he advocated for and their opponents. These are all messages the Commission believes are untrue and that they occurred was harmful to the judiciary as a whole.
(J) The record in this case does not suggest that Judge Fuselier used his position for personal remuneration or financial gain. The record does indicate, however, that Judge Fuselier went to great lengths to curry favor with the business people of the town and to do favors for politicians and others who sought ticket fixing. Such conduct could be expected to result in gain to Judge Fuselier in terms of future support in any bids for reelection or for other public office.