865 So.2d 693 (2004)
In re Judge Joel G. DAVIS.
No. 2003-O-2801.
Supreme Court of Louisiana.
February 4, 2004.
Order Granting Rehearing and Clarifying Decree February 11, 2004.
*694 Nickel & Caballero, Milo A. Nickel, Jr., Lake Charles; Sharp, Henry, Cerniglia, Colvin, Weaver & Hymel, L.J. Hymel, Michael R. Davis, Baton Rouge, for Judge Joel G. Davis.
Office of Special Counsel, Steven R. Scheckman, Special Counsel, for Judiciary Commission.
Nancy E. Rix, Commission Counsel.
CALOGERO, Chief Justice.
This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana that respondent, Joel G. Davis, judge of the 33rd Judicial District Court, Parish of Allen, be suspended from office for a period of one hundred eighty (180) days and further ordered to reimburse the Commission costs incurred in the investigation and prosecution of this judicial discipline case.[1] The recommended discipline arises out of Formal Charge No. 0190 filed by the Office of Special Counsel ("OSC") following an investigation that found improprieties in Judge Davis's appointing his father to represent indigent defendants before him and thereafter recusing himself, as well as in his actions in some of those cases post appointment. The OSC charged Judge Davis with violating La.Code Crim. Pro. art. 671A(2) and Canons 1, 2A, 2B, 3B(4) and 3(C) of the Code of Judicial Conduct (1996). The OSC also charged Judge Davis with engaging in willful misconduct relating to his official duty, for willful and persistent failure to perform his duty, and for persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, all in violation of La. Const. Art. V, § 25C (1974).
Based on stipulations of fact entered into by Judge Davis and the OSC, and the testimony of Judge Davis at the hearing conducted by the Commission, the Commission found the Formal Charge proven by clear and convincing evidence and recommended that the Court suspend Judge Davis for 180 days without pay and order him to reimburse the Commission its costs.
After reviewing the record, we find that the charge against Judge Davis is supported by clear and convincing evidence, the requisite standard of proof for ethical misconduct in judicial discipline cases. However, we find that Judge Davis's behavior warrants a suspension of ninety (90) days and an assessment of costs for the Commission's investigation, rather than the 180-day suspension recommended by the Commission.

FACTS AND PROCEDURAL HISTORY
In 2001, Judge Davis was the only district judge sitting in the 33rd JDC.[2] Mr. Thomas J. "T. J." Davis, the father of Judge Davis, is an attorney in Allen Parish and was the chief indigent defender in the 33rd JDC from 1990 to August 2002.
In a prior Judiciary Commission file numbered 98-1195, State Inspector General Bill Lynch had forwarded a complaint received by his office alleging certain conflicts *695 of interest in Judge Davis's court.[3] On November 2, 1998, Judge Davis's attorney responded, on Judge Davis's behalf, to the complaint, stating that Judge Davis "does not hear any cases involving his father, directly or indirectly." Judge Davis further advised the Commission, through his counsel, that the Indigent Defender Board ("IDB") hired an additional lawyer "who handles cases before Judge Davis." The Commission closed the file with a letter of counseling to Judge Davis, partially in reliance upon Judge Davis's assurance that the conflict of interest with his father had been resolved.
In connection with the same file, Judge Davis asserted that before he took the bench, he wrote three letters to the Supreme Court Committee on Judicial Ethics[4] seeking an advisory opinion on recusal issues.[5] While no formal ethics opinion was issued to Judge Davis, Chief Deputy Judicial Administrator Timothy Palmatier sent a letter, on behalf of the ethics committee, to then Judge-elect Davis dated December 5, 1996, which among other reference material included the Code of Judicial Conduct and the Digest of Opinions of the Supreme Court Committee on Judicial Ehtics.[6] Mr. Palmatier's letter *696 specifically advised Judge Davis as follows: "If you wish to receive a copy of any opinion in the digest, please ask and I will forward it to you." Furthermore, in her January 25, 1999 letter to Judge Davis closing file no. 98-1195, Commission counsel Nancy Rix specifically advised him as follows:
First, the Commission is aware that questions regarding both the obligation to recuse and the obligation to hear a case that is assigned are often difficult to resolve. This can be particularly problematic when a judge sits in a district where he is the sole district court judge. You were correct to solicit assistance from the Judicial Administrator's office with regard to these questions, and you are encouraged to continue to do so. However, when questions are posed that have been answered previously about an interpretation of the Code of Judicial Conduct, the inquiring judge will often be sent copies of prior decisions (based on the same issue but on different facts). This is often responsive and eliminates the need for the question to be submitted to the Supreme Court Committee on Judicial Ethics for a formal opinion. If the judge still believes that his question is not answered, the question will be submitted to the Committee. It is my understanding that Mr. Tim Palmatier sent to you copies of ethics advisory opinions regarding recusal and discussed those issued opinions with you to help you assess their relevance to your facts.
Ms. Lorrie Doyle initiated the proceeding now before this Court by the filing of a complaint against Judge Davis on September 5, 2001, alleging that her son, Christopher Doyle, was arrested and charged with attempted second-degree murder in Allen Parish. Judge Davis appointed his own father to defend Christopher Doyle. On August 16, 2001, Mr. Davis appeared with Mr. Doyle for arraignment and entered a plea of not guilty on Mr. Doyle's behalf. After Judge Davis set the case for a jury trial on November 26, 2001, he granted Mr. Davis's oral motion for an extension of time to file pre-trial motions and denied Mr. Davis's oral motion for bail reduction. Thereafter, the court's minutes reflect that "[i]nasmuch as the court-appointed attorney is Judge Davis'[s] father, Judge Davis recuses himself from this matter." Ms. Doyle complained that she did not believe it was proper for Judge Davis "to make any rulings on my son's case where the judge's father is the attorney for my son!"
The OSC forwarded a copy of Ms. Doyle's complaint to Judge Davis for a response. Judge Davis's lawyer, in written response dated November 12, 2001, pointed out that Judge Davis's father had "served for years as an Indigent Defender prior to Judge Davis'[s] election as judge." Judge Davis's lawyer's correspondence *697 also noted that, once elected, "Judge Davis rescused himself in all matters involving his father." The letter further stated that the IDB had two attorneys on staff, that a system was implemented whereby appointments were alternated between the two attorneys, and that Judge Davis recused himself at 72-hour hearings in which his father was appointed to represent a defendant.[7] Judge Davis's lawyer indicated in this letter, Judge Davis's decision, although it was not his initial practice, to stay on the cases through arraignment in order to expedite them. The letter stated that Judge Davis's practice was to handle arraignments for defendants represented by his father, then recuse himself from those cases.[8] The lawyer's letter expressed concern that if Judge Davis were precluded from appointing his father in the agreed upon manner, he "effectively destroys his father's livelihood."[9]
By letter dated January 24, 2002, the Commission notified Judge Davis that an investigation had been authorized into the allegations of Ms. Doyle's complaint. On October 22, 2002, the Commission filed a Formal Charge against Judge Davis. The Formal Charge alleged that since November 3, 1998, Judge Davis had impermissibly appointed his father as counsel for indigent defendants in 238 specified cases, then recused himself from each case because of his relationship to his father, despite the fact that Judge Davis himself created the conflict by appointing his father to the cases. Furthermore, the charge noted that public funds were required for payment for the services of and hoc judge sitting in place of Judge Davis in these cases.[10] The Commission further alleged that in many cases, Judge Davis impermissibly handled certain preliminary matters, including setting bail, recalling warrants, deciding discovery motions, and arraigning defendants, and then after taking judicial action, recused himself from each case. Moreover, the Charge alleged that in three cases, Judge Davis recused himself but subsequently accepted guilty pleas and sentenced the defendants. Finally, in one case in which Judge Navarre, who preceded Judge Davis in the district court seat, had appointed Mr. Davis, Judge Davis, upon inheriting the case, recused himself but thereafter accepted *698 a guilty plea and sentenced the defendant.
With respect to the Commission's closed file no. 98-1195, the Formal Charge alleged that Judge Davis, "through counsel, by letter dated November 2, 1998, responded to the specific allegations in the complaint by stating that you do not `hear any cases involving [your] father, directly or indirectly,' "and that "an additional lawyer was hired by the [IDB] `who handles cases before Judge Davis.'" The Formal Charge stated that these representations to the Commission "were either untrue, or misleading." The Commission alleged that Judge Davis's conduct violated La.Code Crim. Pro. art. 671(A)(2),[11] as well as the Code of Judicial Conduct and the Louisiana Constitution.[12]
As previously stated, Judge Davis and the OSC thereafter jointly filed a stipulation of facts in which Judge Davis admitted most of the factual allegations in the Formal Charge, but notwithstanding this admission, denied that his conduct violated the Code of Judicial Conduct or La. Const. art. V, § 25(C). With respect to the Commission's file numbered 98-1195, Judge Davis further denied that the statements he made in response to the Inspector General's complaint were either untrue or misleading.
The Commission conducted a hearing on the Formal Charge on July 16, 2003. Judge Davis was the sole witness to testify at the hearing,[13] but he also introduced character evidence in the form of affidavits submitted by judges, as well as the Allen Parish District Attorney.[14]
The Commission made findings of fact based on Judge Davis's testimony at the hearing and after considering the record of this matter, the Commission concluded the Formal Charge was proven by clear and convincing evidence, and that Judge Davis violated the law and the Code of Judicial Conduct.
Specifically, the Commission found that Judge Davis's failure to recuse himself immediately after he appointed his father to represent indigent defendants in his court violated La.Code Crim. Pro. art. 671, as well as Canons 1, 2A, and 3C of the Code *699 of Judicial Conduct.[15] The Commission disagreed with Judge Davis's assertion that the recusal issue was just a question of "timing." The Commission found that the fact that Judge Davis was elected to a one-judge district where his father was an indigent defender created an inherent conflict of interest. Considering the mandatory law regarding a judge's recusal in criminal cases when the judge is related in the first degree to a lawyer in the case, the Commission concluded that Judge Davis violated the law by failing to disqualify himself from presiding over any matter once his father was appointed. The Commission further concluded that the issue presented is black letter law about which there can be no confusion, and that under the test enunciated in In re: Quirk, 97-1143 (La.12/12/97), 705 So.2d 172, this pattern of judicial error constituted ethical misconduct.[16]
The Commission also found that Judge Davis's practice of appointing his father as indigent defender in cases before him, then presiding over various pretrial matters violated Canon 2B because "(a) according to his own admission in testimony, he let the District Attorney, with whom he had a political relationship, sway and influence his judicial actions; (b) ... he let the [IDB], with whom he had a political relationship, dictate whom the judge appointed to defend indigents in his court; and (c) he argued soon after the Lynch complaint was lodged that his father's livelihood would be affected if he did not appoint the father to indigent defender cases, demonstrating that a family relationship influenced his judicial conduct." The Commission viewed it as especially egregious for Judge Davis to accept guilty pleas, to hear motions, and to modify (or decide not to modify) bail with his father in place as a lawyer in these criminal cases. The Commission found that the codal violation was not excused by the fact that this occurred in relatively few cases.
Additionally, the Commission found that Judge Davis's appointment of his father as counsel for indigent defendants violated Canon 3B(4) in two respects. "First, that appointment created an appearance of impropriety. Second, the Commission members considered it a basic tenet of judicial ethics that should be obvious to all members of the judiciary that a judge should not appoint his father as an attorney[ ] in a proceeding before the judge son." The Commission found that making such an appointment violates the prohibition on nepotism that is part of Canon 3 B(4). The Commission was not persuaded by Judge Davis's argument that a conflict of interest on the part of the chief indigent defender can only be asserted by the indigent defendant attorney in question. On its face, La.Rev.Stat. 15:145 recognizes that indigent defenders may have conflicts of interest and provides a remedy for such situations. The Commission felt that this fact, together with La.Code Crim. Pro. art. 671(A)(2) and Canon 3 C of the Code of Judicial Conduct, should have caused Judge Davis to stop and examine the ethical propriety of his appointment and recusal practices. Judge Davis testified that he did not consider all of these things because it did not occur to him that he could do something other than observe the *700 IDB's attorney rotation. Even if this were true, the Commission found that Judge Davis remained responsible for knowing and complying with rules regarding recusal and acting in accordance with them.
In connection with Judge Davis's case the Commission considered State v. Browning, 483 So.2d 1008 (La.1986).[17] According to the Commission, the Browning case makes it clear that Judge Davis's conduct in appointing his father as counsel for the defendants appearing before him for arraignment and limited preliminary matters created reversible judicial error. The Commission found no indication that Judge Davis had prior knowledge of the Browning case in this Court's jurisprudence, but found that his ignorance of the case did not excuse Judge Davis for actions inconsistent with La. Code Crim. Pro. art. 671(A)(2) and Canon 3 C, which govern recusal. The Commission found that other errors by Judge Davis apparent in the record were his "unrecusing" himself after disqualifying himself in the first place, and his assertion that he was compelled to appoint his father to cases involving indigents under the rotation set by the IDB, because of the statutory rules governing those boards.[18] The Commission found that neither of these latter errors, nor Judge Davis's being unaware of the Browning case, constituted ethical misconduct, but nevertheless found a pattern of judicial error by Judge Davis which can constitute misconduct under the Commission's interpretation of Quirk. See also In re: Fuselier, 02-1661 (La.1/28/03), 837 So.2d 1257.
The Commission's "Conclusions of Fact and Law" stated that "[t]he record is clear that in 1996 when Judge Joel Davis queried the Supreme Court Judicial Administrator's office, he received the answer to his question about what he should do as the result of his father being an Allen Parish indigent defenderthat answer was that Judge Davis was obligated to recuse himself." The Commission further concluded that "Judge Davis admitted at the hearing that he received ... the index that described [several] advisory opinions" and that they "made it clear that a judge must recuse, even in connection with preliminary matters, when a close relative is employed as an attorney in the cause." Giving Judge Davis the benefit of the doubt that as a brand new judge who perhaps did not grasp the meaning of these opinions and their application to him, the Commission noted that it could not *701 accept that two years later, when Judge Davis received the Commission's letter of counseling and closure in January 1999 (closing the file opened about Judge Davis allegedly presiding over cases involving both his father and another lawyer), he did not understand that the Commission was communicating the members' view that his question had been answered. The Commission stated its belief that a letter closing a file about a complaint of judicial ethical misconduct would have been important to Judge Davis and he would have read it carefully. If the Commission was incorrect in the assumption expressed in that letter, that Mr. Palmatier had addressed Judge Davis's questions about recusal, Judge Davis should have spoken up at that time.
The Commission did not find Judge Davis's assertion regarding his response to the IG's letter compelling, simply by reference to the four corners of that letter.[19] The Commission found that the only inference that could be drawn from Judge Davis's response was that he no longer presided over any cases handled by his father as an indigent defender.
In recommending discipline, the Commission looked to the factors set forth by this Court in In re: Chaisson, 549 So.2d 259 (La.1989). In Chaisson, this Court, citing Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct;
(b) the nature, extent and frequency of occurrence of the acts of misconduct;
(c) whether the misconduct occurred in or out of the courtroom;
(d) whether the misconduct occurred in the judge's official capacity or in his private life;
(e) whether the judge has acknowledged or recognized that the acts occurred;
(f) whether the judge has evidenced an effort to change or modify his conduct;
(g) the length of service on the bench;
(h) whether there have been prior complaints about this judge;
(i) the effect the misconduct has upon the integrity of and respect for the judiciary; and
(j) the extent to which the judge exploited his position to satisfy his personal desires.
Id. at 266.
The Commission applied all ten of the Chaisson factors to its findings with regard to the Formal Charge against Judge Davis and made relevant findings regarding each.[20]
*702 The Commission concluded that Judge Davis acted in bad faith, particularly when he told the Commission that the factual conflicts of interest with which he had previously grappled had been resolved. A majority of the members of the Commission found that the record overwhelmingly showed Judge Davis's actions violated the Code of Judicial Conduct and the Louisiana Constitution of 1974, and that Judge Davis should be disciplined by this court.
Based on these considerations, the Commission recommended that Judge Davis be suspended from judicial office for 180 days, and ordered to reimburse and pay the Commission's costs in investigating the matter.

DISCUSSION
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C). Therefore, this court has the power to make determinations of fact based on the evidence in the record and is not bound by, nor required to give weight to, the findings and recommendations of the Judiciary Commission. In re Wimbish, 98-2882 (La.4/13/99), 733 So.2d 1183, 1186; In re Quirk, 97-1143 (La.12/12/97), 705 So.2d 172; In re Whitaker, 463 So.2d 1291, 1298 (La.1985).
The grounds for disciplinary action against a judge are set forth in La. Const. art. V, § 25(C), which provides in pertinent part:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct *703 while in office which would constitute a felony, or conviction of a felony.
In addition to these substantive grounds for disciplinary action, this court has adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996, which is binding upon all judges. Violations of the Canons contained therein may, without more, serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325; In re Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181. The charge or charges against a judge must be proved by clear and convincing evidence before this court can impose discipline. In re Hunter, 823 So.2d at 328; In re Bowers, 98-1735 (La.12/1/98), 721 So.2d 875, 880.
We now address the merits of the Formal Charge against Judge Davis as well as the Judiciary Commission's recommendation of discipline. As recognized by the Judiciary Commission in its findings, Judge Davis's chosen method of appointing his father and then later recusing himself constituted a pattern or practice of legal error of failing to follow and apply the law. The actions taken by Judge Davis are self-evident based upon the transcripts and records of the proceedings involved. Nevertheless, Judge Davis has not admitted that his conduct violated certain Canons alleged in the charge. Specifically, Judge Davis admits that he violated La.Code Crim. Pro. art. 671 and Canons 1, 2 A, and 3 C because of his handling of four guilty pleas and preliminary matters where his father represented a defendant. However, Judge Davis denies that he violated Canon 2 B or 3 B(4).
Canon 2 B provides, in pertinent part: "A judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment...." Canon 3 B(4) states in pertinent part:
A judge shall not make unnecessary appointments. A judge should exercise the power of appointment impartially and on the basis of merit. A judge should avoid appointments which tend to create the appearance of impropriety.... A judge shall avoid nepotism. No spouse or member of the immediate family of a judge shall be employed in the court to which that judge was elected....
The provisions of this Subsection shall not prohibit the continued employment of any employee of a court employed by such court on or before December 31, 1990; nor shall such provisions be construed to hinder, alter, or in any way affect promotional advancements for any such employee.
We agree with the Judiciary Commission's findings that Judge Davis's conduct violated Canons 2 B and 3 B(4). However, with regard to Canon 2 B, we do not find that Judge Davis allowed "political relationships" to influence his judgment. That a judge conferred with a district attorney on administrative or other matters of this sort is hardly chargeable as a "political relationship" that improperly influenced judicial conduct or judgment, even though such conferring may well have assisted the judge in making administrative decisions. Similarly, we do not find that Judge Davis's implementation of the rotation for appointments provided by the IDB, a continuation of his predecessor's procedure, constitutes a "political relationship" that influenced his judicial conduct or judgment. Nonetheless, and subject to the foregoing reservations, we do find that the record supports the Commission's finding that Judge Davis allowed a family relationship to influence his judicial conduct or judgment in violation of Canon 2 B.
Furthermore, regarding Canon 3 B(4), Judge Davis's belief that he could appoint *704 his father to the indigent defendant at the 72-hour hearing and later recuse himself was, at the least erroneous. Judge Davis's impartiality could reasonably be questioned through the system of appointments he chose to implement. Accordingly, we find his actions also violated Canon 3 B(4).
We will now consider the Commission's recommendation of a 180-day suspension for the respondent judge. Our jurisprudence with regard to "failure to recuse" cases is limited and therefore lends minimal guidance on what discipline is fitting for this unique case.[21] However, the case here does not involve a failure to recuse in a case where it is later determined that, for reasons personal to the judge, recusal was required. Rather, this case involves a judge who followed an earlier instituted policy of rotating appointed counsel to indigent defendants which resulted in his improperly appointing his father to represent indigent defendants appearing before him on, admittedly, numerous occasions.[22] More significantly, Judge Davis submitted responses to the Commission, regarding a complaint against him, which were misleading.[23] We find that the aggregate of these factors, but most especially the misleading responses to the Commission, requires a 90-day suspension.
Most critical to our decision is that Judge Davis, through his attorney, misled the Commission in the written response to the allegations in File No. 98-1195 when he said, through counsel: "Judge Davis does not hear any cases involving his father, directly or indirectly" and that an additional lawyer was hired by the Indigent Defender Board "who handles cases before Judge Davis." The statements in the response letter to the Commission were misleading since they led the Commission to believe that there was "no conflict of interest or potential conflict of interest... between a son who sits on the bench and his father who is ... the district's indigent defender," as was suggested *705 in the complaint received by the Inspector General.[24]
We do not find convincing Judge Davis's contention that he thought his answer was responsive only to complaints about conflicts involving civil cases. The Inspector General's complaint mentions a potential for conflict between the son on the bench and the father who is an indigent defense lawyer in its opening paragraph, which would reasonably have alerted the reader that the complaint did not involve only civil cases and that any response to such a complaint should address more than only civil matters. Furthermore, Judge Davis's letter does address the IDB's hiring an additional attorney in the response directly following Judge Davis's assertion that he no longer hears any cases involving his father. The reader could not be expected to have read each response in a vacuum, but rather, as suggested by Judge Davis himself, as a whole in light of the entire complaint letter. When read together, Judge Davis's responses more than likely should reasonably be understood to mean that any problem or potential conflict had been resolved by virtue of the fact that the IDB had hired another attorney and that Judge Davis no longer heard any cases in which his father was involved, including civil or criminal cases.
Furthermore, even if this response were made with the utmost candor, there could have been little or no doubt in Judge Davis's mind when he received Nancy Rix's letter in January, 1999, closing the complaint the Inspector General had forwarded to the Commission, that the Commission not only believed that Judge Davis's questions regarding recusals had been answered, but that they were closing the file based in large part on the reassuring responses they had received from Judge Davis's attorney.
Regardless of Judge Davis's intent when he responded to the IG complaint, we find that the responses did mislead the Commission in that those responses reasonably caused the Commission to think that its concerns about Judge Davis appointing his father and other potential conflicts of interest were at an end. If there was any confusion on Judge Davis's part about what that letter meant, instead of continuing to appoint his father and hearing certain preliminary matters in which his father was counsel for the defendant, he should have again sought guidance from the Commission. Judge Davis did not do so. Instead he continued to follow the same procedure he had before he received the initial complaint and after he responded to that complaint.
Therefore, while we do not find that Judge Davis's responses to the Commission were knowing falsehoods, we do find that Judge Davis knew or should have *706 known that his and his lawyer's responses would mislead the Commission. Such misleading statements made to the Commission, along with Judge Davis's admitted violation of Canons 1, 2 A, and 3 C, and our further finding that Judge Davis violated Canon 2 B by allowing a family relationship to influence his judicial conduct or judgment, and violated Canon 3 B(4) through the routine appointment of his father to represent indigent defendants before him, adequately support a 90-day suspension.

DECREE
Accordingly, for the reasons stated herein, it is ordered, adjudged, and decreed that the respondent, Judge Joel G. Davis of the 33rd Judicial District Court, Parish of Allen, State of Louisiana, be, and is hereby, suspended from office for a period of ninety (90) days to commence upon finality of this judgment. We further cast respondent with costs of $1,532.77 incurred in the investigation and prosecution of this case.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, Justice dissenting.
A 90-day suspension trivializes Judge Davis' conduct. This judge, with full knowledge of the conflict of interest, appointed his father to represent indigent defendants in his section of court, not once, but in 238 separate cases. Judge Davis admitted to a practice of handling arraignments, setting bonds, and accepting guilty and not guilty pleas from defendants who were represented by his father. He then lied to the Judiciary Commission in his response letter, suggesting that he did not "hear any cases involving his father, directly or indirectly."
We should not characterize Judge Davis' untruthful response as false or misleading, especially in light of our recent decision to remove a judge from judicial office for lying to the Commission. In In re Judge C. Hunter King, 03-1412 (La.10/21/03), 857 So.2d 432, the former Judge King admittedly lied in his response letter to the Commission, as well as in his testimony before the Commission. This Court, quoting Stanley v. Jones, 201 La. 549, 9 So.2d 678, 683 (La.1942), in which a district court judge was removed for lying, stated:
The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well.
In Re Judge King, at 25. This Court went on to cite Inquiry Concerning Couwenberg, No. 158, Decision and Order (Aug. 15, 2001), a case from another jurisdiction in which a judge was removed, and stated, "Honesty is a `minimum qualification' expected of every judge."[1] Consequently, in a unanimous decision, this Court concluded that Judge King's removal from the bench was warranted.
The majority attempts to distinguish the facts of this case from those of In Re Judge King by pointing out that the former Judge King lied both in his response letter, through his attorney, to the Commission and in his testimony before the *707 Commission when the denied the allegations of campaign misconduct. The majority notes that in this case, Judge Davis, through his attorney, only "misled" the Commission in the written response by denying that he hears cases involving his father. In my mind, the former Judge King's lies were no more egregious that the lie told to the Commission by Judge Davis in his written response to the Commission "through his attorney."
Protecting the constitutional rights of criminal defendants is far more important than our concern for ethical violations involving judicial campaigns. Therefore, in keeping with our action in the King case, I believe that Judge Davis' removal from judicial office is warranted in this case.
PER CURIAM.
Rehearing is granted ex proprio motu for the sole purpose of clarifying the court's decree of February 4, 2004. That decree was silent regarding whether the suspension was to be served with pay or without pay. The court's resolution was in fact that the suspension be served without pay.
Therefore, the decree is amended to provide that Judge Joel G. Davis of the 33rd Judicial District Court, Parish of Allen, State of Louisiana be suspended from office for a period of ninety days without pay to commence upon finality of this judgment. In all other respects the decree remains unchanged.
The right is reserved to the parties to apply for a rehearing from this per curiam action pursuant to Louisiana Supreme Court Rule IX, § 1.
JOHNSON, J., concurs in the suspension without pay, but reurges the belief that a more severe penalty is warranted.
NOTES
[1] Judge Davis was elected in 1996 and assumed his office on January 1, 1997. He has served continuously since that time.
[2] A second judgeship was created in the 33rd JDC in 2002.
[3] The August 21, 1998 letter from the Inspector General stated:

An anonymous caller who identified himself as an attorney has complained to this office that a conflict of interest or potential conflict of interest exists in the 33rd Judicial District, Allen Parish, between a son who sits on the bench and his father who is a practicing private attorney as well as the district's indigent defender and prosecutor for the city of Oakdale.
After reviewing the complaint, it is our conclusion that this office does not have jurisdiction and we are, therefore, referring this matter to you for consideration.
The complaint states that when the judge took his seat on the bench 18 months ago, his private cases were going to an attorney from Lafayette to handle. The Lafayette attorney, who has moved his practice to Allen Parish, also handles cases for the father if those cases are scheduled for the son's court. It was claimed that the Lafayette attorney has enjoyed a remarkable success rate.
The indigent defender complaint is that it costs the parish an additional $40,000.00 a year to employ a second indigent defender to handle cases that would come before the son....
The judge was identified as Joel Davis and the father as T.J. Davis.
I do not know if the claims have any merit and have no further information.
[4] The Supreme Court Committee on Judicial Ethics ("Committee") was created by this court in order that the Code of Judicial Conduct may be properly interpreted, and in order to provide a forum to receive inquiries from members of the judiciary related to the interpretation of the canons. The Committee is composed of the following members: the Chief Justice and one other member of the Supreme Court; the Chairperson of the Conference of Court of Appeal Judges and one other Court of Appeal Judge; the President of the District Judges Association and two other District Judges; the President of the City Judges Association; one juvenile or family court judge; the Judicial Administrator; and the President of the Louisiana State Bar Association. The function of the Committee is limited to the issuance of advisory opinions on its own motion or in response to the questions of an ethical nature which may be posed to this body by any judge affected by the canons. While these opinions, rendered for the benefit of the inquiring judge, provide generally accurate counsel, they are not binding authority on this court. In Re McInnis, 00-1026, p. 4 n. 4 (La.10/17/00), 769 So.2d 1186, 1189 n. 4.
[5] By letters dated November 7, 1996, December 4, 1996, and December 19, 1996, then Judge-elect Davis submitted requests for guidance on dissolving his law practice and the anticipated impact his father's continuing practice would have on his judicial position.
[6] As of the date of Mr. Palmatier's letter, there were four opinions from the Louisiana Supreme Court Committee on Judicial Ethics that were relevant to the issue of whether it was permissible for Judge Davis's father to appear before him as an attorney. See Opinion No. 100 (March 6, 1992) (it is not ethically permissible for a judge to preside over matters, whether complex or routine, e.g., arraignments, signing of search warrants and arrest warrants, uncontested plea bargains, etc., presented to him/her by the Louisiana Wildlife and Fisheries Department, when that judge's spouse is the Deputy Director of the Wildlife and Fisheries Department, and the disclosure to counsel, with subsequent recusal should objection arise, is not an ethically permissible alternative as it does not overcome the appearance of impropriety); Opinion No. 110 (April 8, 1993) (it is ethically impermissible for a judge to allow an attorney related to that judge to enroll as counsel in a matter pending before that judge when no action has been taken by that judge regarding the substantive merits of the matter, when such enrollment creates the need for the recusal of that judge); Opinion Nos. 55 (February 15, 1982) and 96 (December 13, 1991) (it is not ethically permissible for a judge to preside over cases where one of the parties is represented by his brother and first cousin respectively).
[7] The term "72-hour hearing" is derived from La.Code Crim. Pro. art. 230.1 which provides in pertinent part:

A. The sheriff or law enforcement officer having custody of an arrested person shall bring him promptly, and in any case within seventy-two hours from the time of the arrest, before a judge for the purpose of appointment of counsel....
B. At this appearance, if a defendant has the right to have the court appoint counsel to defend him, the court shall assign counsel to the defendant. The court may also, in its discretion, determine or review a prior determination of the amount of bail....
[8] Judge Davis did not obtain waivers of the conflict of interest from any of the defendants in these cases.
[9] Judge Davis has suggested that his refusal to appoint his father to any cases would necessarily have resulted in the termination of his father's employment with the IDB.
[10] The cost of these ad hoc appointments totaled approximately $19,595.88. Admittedly, had Judge Davis not appointed his father there still would have been a financial imposition on the criminal justice system of one sort or another. It either would have made it difficult for the IDB in that it would have had to hire another lawyer to handle the case load or further burden an already burdened IDB attorney to handle Mr. Davis's cases, or the state would have borne the expense for an ad hoc appointee. So while the cost of the ad hoc appointments here was $19,595.88, in fact the appointment of Mr. Davis or Judge Davis's tardy recusals did not result in a net loss of that full amount to the state or the judicial system.
[11] La.Code Crim. Pro. art. 671(A)(2) provides in pertinent part that a trial or appellate court judge shall be recused in a criminal case when he "is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree...."
[12] The Commission alleged Judge Davis's conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2B (a judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment, nor shall a judge lend the prestige of judicial office to advance the private interest of the judge or others), 3B(4) (a judge should avoid appointments which tend to create the appearance of impropriety and shall avoid nepotism), and 3C (a judge shall disqualify himself in a proceeding in which disqualification is required by law or Supreme Court rule) of the Code of Judicial Conduct. The Commission further alleged that Judge Davis engaged in willful misconduct relating to his official duty, engaged in willful and persistent failure to perform his duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C).
[13] This was agreed upon at the time the stipulation of fact was confected between the parties and was approved by the Commission.
[14] The affidavits were submitted by Retired Judge John Navarre, Retired Judge Lewis Lauve, Judge Patricia Cole, United States District Judge Richard T. Haik, and District Attorney Douglas L. Hebert, Jr.
[15] In its findings, the Commission also chided Judge Davis for appointing his father at the outset as is noted hereinafter.
[16] In Quirk, this Court held that a judge may be found to have committed misconduct "by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error." 705 So.2d at 180-181.
[17] The defendant in Browning, who was facing a drug charge, appeared before Judge Paul Newell without an attorney, explaining that his retained attorney had died three weeks earlier. Judge Newell told Mr. Browning that for purposes of the arraignment alone he would appoint a member of the indigent defender board, and he thereupon appointed his son, David Newell, an IDB attorney. With the assistance of Judge Newell's attorney-son, the defendant pleaded not guilty and requested a jury trial. That same day, the defendant and David Newell appeared before Judge Newell so that the defendant could change his plea to guilty, pursuant to a plea bargain. Judge Newell Boykinized the defendant and then accepted the guilty plea. Later, the defendant appealed his sentence, arguing, among other things, that he was denied effective assistance of counsel because his appointed attorney was the judge's son and therefore had a "built-in conflict of interest." The court of appeal recognized the conflict but found no prejudice to the defendant. State v. Browning, 475 So.2d 90 (La.App. 2nd Cir.1985). This Court reversed, holding that Judge Newell's appointment of his son as counsel for the defendant constituted plain error.
[18] Judge Davis testified that he recalled his recusal because an ad hoc judge had not been appointed in the case and the defendant would have been required to stay in jail longer than would be necessary if he just accepted the plea.
[19] Judge Davis claimed that he did not consider his response to the complaint submitted by the IG to refer to the conflict created by his father being indigent defender. However, the Commission noted that the IG's correspondence specifically refers to Mr. T.J. Davis in the first paragraph and in the second and third to last paragraphs. Furthermore, the Commission did as Judge Davis suggested and compared the IG's letter "side by side" with the responses of Judge Davis's attorney, and, even giving credence to Judge Davis's statements at the hearing that the responses to the complaint referred only to civil cases, the Commission still could not be persuaded to credit Judge Davis's interpretation.
[20] The Commission set out their findings as such:

(a) and (b) The misconduct described in the Formal Charge reflects a pattern of problems with failure to disqualify.
(c) and (d) Judge Joel Davis's actions as described in the Formal Charge occurred as part of his duties on the bench.
(e) At the hearing, Judge Joel Davis did not take full responsibility for his violations of the Code of Judicial Conduct.
(f) The circumstances that led to the ethical misconduct are not expected to reoccur.
(g) Judge Joel Davis was a new judge when the initial failure to recuse occurred. In fact, when the issues of unethical failure to disqualify were first presented to the Judiciary Commission the members closed the file with a letter of counseling, based in part upon the occurrence of the problem so early in Judge Davis's career and further recognizing the difficulties experienced by a judge in a one-judge district. Equally important, however, the Commission closed the early complaint privately based upon the members' belief that the recusal problems were solved. This conclusion was drawn solely from Judge Davis's communication to the Commission that he was not hearing cases brought by his father and that the IDB had hired another attorney. This turned out to be false, and it is Judge Davis's conduct and failure to recuse during the time that commenced late in his second year on the bench that forms the basis for the Commission recommending to the justices that they impose judicial discipline in this case.
(h) There have been prior complaints to the Commission concerning Judge Davis and his failure to recuse in cases involving his father, Mr. T.J. Davis, as described in the stipulated facts and in the conclusions drawn by the Commission.
(i) Judge Joel Davis's violation of the Code of Judicial Conduct has undermined the judicial process and was and is prejudicial to the administration of justice because his actions created the appearance to the citizens of Allen Parish that politics and family relations can control judicial conduct in their district.
(j) The allegations of the Formal Charge, which have been deemed proven by the requisite standard, reflect that Judge Joel Davis's ethical misconduct did not provide to him any monetary advantage, but those actions financially benefitted his father. Further, Judge Davis's handling of the recusal issue stood to garner him political advantages that could potentially benefit him in later races for judicial or other public office.
[21] See, e.g., In re Lemoine, 96-2116 (La.1/14/97), 686 So.2d 837, on reh'g, 692 So.2d 358, (judge engaged in ethical misconduct by failing to recuse himself from criminal cases in which defense counsel were attorneys with whom he co-owned real estate and/or to whom he rented office space and thus was publicly censured).
[22] In Mississippi Commission on Judicial Performance v. Peyton, 812 So.2d 204 (Miss. 2002), pursuant to a stipulation of facts and an agreed recommended penalty, the Mississippi Supreme Court suspended the judge for thirty days for appointing his daughter, one of the public defenders in the county, as counsel for a murder suspect who came before the court for an initial appearance, but further proceedings were heard by another public defender. The judge had also engaged in other misconduct and had a prior disciplinary history.
[23] In In re King, 03-1412 (La.10/21/03), 857 So.2d 432, a distinctly different kind of judicial discipline case, and involving conduct much more egregious than in this case, this Court removed that judge from the bench. Former Judge King was accused, in two separate charges, with campaign misconduct and lying about that campaign misconduct to the Commission. Id. The complaint alleged, among other things, that Judge King terminated his court reporter because she refused to sell tickets to a campaign fund-raising event on his behalf. Id at 434. In Judge King's response to the Commission, through his attorney, he specifically denied all of the allegations. Id. Thereafter, in sworn testimony generated during the Commission's investigation, Judge King persistently responded in the negative to questions whether he engaged in misconduct. Id. at 441. Former Judge King admitted, at a later hearing, that his previous statements under oath had been false, after he was confronted with audio tapes which contradicted most of his earlier responses. Id. Therefore, former Judge King not only lied in his response letter to the Commission, but he also later lied under oath before the Commission.
[24] Judge Davis denied that he tried to mislead the Commission when his lawyer responded to the Inspector General's complaint on his behalf. Judge Davis took the position that presiding over certain preliminary matters after his father was appointed as the indigent defender did not constitute "hearing cases." Further, Judge Davis testified that because he felt that the IG complaint concerned only civil cases, and he did not preside over any civil cases involving his father, that his lawyer was accurately responding to the Commission to that effect in his letter. Judge Davis further maintained that his lawyers' response letter about the 1998 complaint had to be read side by side with the complaint itself, implying that doing so would make it clear that the statements in question referred only to the part of the complaint about the Lafayette lawyer and not to Mr. T.J. Davis. Furthermore, Judge Davis denied that his lawyer's letter to the Commission which stated that the IDB hired another attorney to hear cases before Judge Davis was misleading, stating, "They hired another attorney. I don't know why they hired the attorney. I know he was hired prior to my taking office."
[1] In Couwenberg, the judge made false statements in personal data questionnaires he filled out when seeking judicial office and also lied in a sworn statement taken during the judiciary commission's investigation.